WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shane Marcus Turnbo,<br><br>           Petitioner,<br><br>vs.<br><br>Charles L. Ryan,<br><br>           Respondent. | CIV 14-113-PHX-SLG (MHB)<br><br>**REPORT AND RECOMMENDATION** |

TO THE HONORABLE SHARON L. GLEASON, UNITED STATES DISTRICT COURT:

Petitioner Shane Marcus Turnbo has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). Respondent filed an Answer (Doc. 18), but despite having an opportunity to do so, Petitioner has not filed a reply.

### BACKGROUND[1]

The Arizona Court of Appeals summarized the basic facts underlying Petitioner's convictions as follows: "The charges arose out of an attempted armed robbery of Tempe Loan Company. During this attempt, a shootout ensued resulting in injuries to one of two employees and the death of an accomplice." (Exh. Q at 2, ¶ 2.)

On May 26, 2002, Charles Robles and James Delcoure were working at the Tempe Loan Company, which is a pawn shop located in Tempe, Arizona. (Exh. QQ at 33-34, 105-

---

[1] Unless otherwise noted, the following facts are derived from the exhibits submitted with Doc. 18 – Respondent's Answer.

06.) At around noon, Craig Carter, "a friend of the owners and management of the store," stopped by to bring them lunch. (Id. at 50-51, 54, 107.) When Craig left the store, he noticed a "suspicious" vehicle parked on the side of the building in the alley way, and called Charles to let him know that there was "a car on the side of the building" and to "go check it out." (Id. at 51, 54; Exh. RR at 126.) Charles walked around the corner of the building and saw at least three black males siting in a vehicle. (Exh. QQ at 52-54.) Charles assumed that they were "doing drugs in the car," and returned to the store. (Id. at 53-54.)

Around 2:30 p.m., Petitioner and co-defendant Frederick King walked into the pawn shop and approached the counter. (Id. at 42-43, 46-49, 54, 108-11.) King was holding a gold watch and a digital camera, and asked Charles "what kind of money [he] would give them for the two items." (Id. at 44.) After examining the camera and watch, Charles made an offer. (Id.) King hesitated, stating that he wanted to first "go down the street" to another pawn shop and "see if they would give him more money." (Id. at 45.) King took the items, and the two men left. (Id. at 45, 50.)

At approximately 4:30 p.m., Petitioner and King returned to the pawn shop with the two items, and told Charles that they would accept his previous offer. (Id. at 55-57, 117-18; Exh. RR at 43.) Charles agreed and asked for King's identification. (Exh. QQ at 57.) King told Charles that he had left his "ID" in "the truck," and sent Petitioner to retrieve it. (Id.) Petitioner returned "several minutes" later, but without any identification, and told King "that the truck wasn't there" and that "she had left." (Id. at 57-58.) Petitioner then made several phone calls, in what appeared to be an attempt to compel whoever had left with the identification to come back to the store.[2] (Id. at 58-62.) Charles assured them that he would wait for the identification to arrive, even if it meant staying past closing time – 5:00 p.m. (Id. at 61, 119.)

---

[2] It was later determined that one of the phone calls was made to an accomplice, Andre McDaniels. (Exh. SS at 10-15.)

- 2 -

1    Just before 5:00 p.m., Charles noticed a third individual, Andre McDaniels, walking
2    across the far side of the parking lot towards the store. (Id. at 65-70.) Petitioner greeted
3    McDaniels outside and asked, "Do you have that ID? Do you have that ID?" (Id. at 68.)
4    McDaniels shook "his head no." (Id.) When they entered the store, King asked McDaniels,
5    "Do you have that ID[?]" (Id. at 70.) McDaniels said, "No." (Id.) King then asked, "My
6    Atlanta ID[?]" (Id.) McDaniels replied, "Yeah." (Id.) King then said, "Well, give it to the
7    man. They want to go home." (Id.)

8    At that point, McDaniels put his hand in his pocket as if "to produce an ID." (Id. at
9    70-71.) Charles, who was behind the counter, assumed this was his intention, and looked
10   down at the computer monitor to begin the transaction. (Id. at 71.) Suddenly, Charles felt
11   "burning sensations in [his] leg," and "fell to the ground." (Id. at 72.) It became quickly
12   apparent to Charles that he had been shot. (Id. at 73.)

13   Charles looked up to his right and saw King standing behind the counter, pointing a
14   gun at him and continuing to fire rounds. (Id. at 73-75, 102-03.) From the ground, Charles
15   managed to draw his handgun, and began shooting back at King. (Id. at 74-75.) King took
16   a few steps back and then disappeared. (Id. at 75-76.) Charles looked down at his legs and
17   saw "gushing blood." (Id. at 75-76.) As he laid on the floor, he could hear gunshots coming
18   directly from the other side of the counter. (Id. at 77-79.) Charles looked over the counter and
19   saw Petitioner and McDaniels standing there. (Id. at 77-79.) Charles could hear "one of
20   them" discharging a firearm. (Id. at 77-79.) Charles "shot over the counter at them." (Id. at
21   79.) Charles then called 9-1-1. (Id. at 81.)

22   James had been standing towards the front of the store when McDaniels entered. (Id.
23   at 71.) As McDaniels approached the counter, James turned his back to examine an antique
24   sewing machine. (Id. at 131-32.) As he bent down to look at the sewing machine, "the handle
25   exploded" and shattered into "little pieces." (Id. at 132-33.) James quickly turned around and
26   saw King standing behind the counter, firing a gun. (Id. at 133-35.) He did not see Charles,
27   but could hear him responding to the gun fire. (Id. at 133-34.) James drew his handgun,
28   yelled, "Drop the gun," and fired one round at King. (Id. at 135.) As James turned to face

1  Petitioner, Petitioner pointed a gun directly at him and fired. (Id. at 137, 167-68.) By this
2  time, James was convinced that Charles had been killed, and tried to break for the exit to
3  escape. (Id. at 137-39.) As he reached the doors and turned to back out, he saw McDaniels,
4  who was holding a gun, and King coming directly at him. (Id. at 138-39.) James fired one
5  round at McDaniels "point blank," striking his right armpit. (Id. at 138-39; Exh. RR at 21.)
6  James then fired a second round at King as King pushed his way through the doors. (Exh. QQ
7  at 137-39.)

8        After they exited, McDaniels "made a small looping curve" in the parking lot and then
9  slowly dropped to the ground, where he died from his gunshot wound. (Id. at 139-41; Exh.
10 RR at 19-21.) King ran across the street, where he was picked up by a getaway vehicle,
11 driven by co-defendant Christopher Mays – King's cousin – and sped off. (Exh. QQ at 141-
12 42; Exh. UU at 8, 30-32.) Petitioner escaped through the front doors of the shop and ran to
13 a nearby apartment complex. (Exh. RR at 100-02, 105, 117; Exh. UU at 34.) There,
14 Petitioner asked a resident of the complex if he could use the phone, and arranged to have
15 someone pick him up. (Exh. RR at 106-12.) The resident testified that Petitioner appeared
16 to be "fatigued," "sweating," and "short of breath," as if he had been running. (Id. at 108-09.)

17       Meanwhile, King and Mays waved down a passing fire truck for medical attention,
18 and pulled into a business parking lot. (Exh. UU at 35-36.) Paramedics at the scene
19 discovered that King was wearing a bullet-proof vest. (Exh. QQ at 175; Exh. RR at 138; Exh.
20 SS at 7.) Inside the vehicle, officers found two pairs of gloves, a black nylon holster, a gym
21 bag, a red bandana, a red full-faced ski mask, and a sawed-off shotgun. (Exh. TT at 27-28.)
22 The vehicle was later identified as the vehicle that had been parked in the alley way next to
23 the pawn shop earlier in the afternoon. (Exh. RR at 30-32, 128.)

24       On January 27, 2003, the Maricopa County Grand Jury indicted Petitioner for one
25 count of first-degree murder (Count 1); two counts of attempted second-degree murder
26 (Counts 2 & 3); and one count of attempted armed robbery (Count 4). (Exh. A.)

1    Petitioner was initially represented by Deputy Public Defender John Taradash, but he
2  moved to withdraw because of a conflict of interest. (Exh. B.) Petitioner then retained private
3  counsel, Robert C. Billar.[3] (Exhs. C & D.)

4    The jury found Petitioner guilty as charged in the indictment. (Exh. VV at 5-8.)
5  Petitioner filed a motion for new trial, arguing that the trial court improperly provided the
6  jury an opinion as to the evidence in response to a jury deliberation question. (Exh. E.) The
7  trial court denied the motion. (Exh. WW at 3-4.)

8    At sentencing, the trial court found the following aggravating circumstances: "the
9  grave risk to others, the pecuniary gain, the emotional harm to the victims, presence of an
10 accomplice, [and] the fact that there was an ambush." (Exh. WW at 28-29.) The court found
11 the following mitigating circumstances: Petitioner's "lesser involvement," his "lack of a
12 criminal record," his "age," and his "family support." (Id. at 29.) The trial court imposed a
13 25-years-to-life sentence with the possibility of parole for Count 1, aggravated 15-year
14 sentences for Counts 2 and 3, and a presumptive 7.5-year sentence for Count 4. (Id.; Exh. F.)
15 It ordered the sentence for Count 2 to run consecutively to the sentence for Count 3, and the
16 remaining sentences to run concurrently. (Exh. F; Exh. WW at 29-30.)

17   After sentencing, trial counsel moved to withdraw, and the trial court appointed the
18 Public Defender's Office to represented Petitioner for his appeal. (Exhs. G & H.)

19   Petitioner timely commenced his direct appeal by filing a notice of appeal. (Exh. I.)
20 The Maricopa County Public Defender's Office moved to withdraw as counsel because of
21 a conflict of interest. (Exh. J.) The Arizona Court of Appeals granted the request and
22 appointed the Office of the Legal Advocate to represent Petitioner. (Exh. K.) The Office of
23 the Legal Advocate then moved to withdraw because of a potential conflict of interest. (Exh.
24 L.) The Arizona Court of Appeals granted the motion and appointed Theresa Armendarez
25 to represent Petitioner. (Exh. M.)

---

[3] Another lawyer at Mr. Billar's law firm represented Mr. King. (Exh. MM at 3; Exh. OO at 4.) The potential conflict was twice explained to Petitioner, and Petitioner twice stated he wanted Mr. Billar to continue to represent him. (Exh. MM at 3-11; Exh. OO at 3-8.)

- 5 -

Petitioner presented, through counsel, three issues for review:

(1) Did the trial court reversibly err in its instruction to the jury regarding the offense of attempted second-degree murder?

(2) Did the trial court reversibly err by imposing aggravated sentences based upon factual findings that were not found by the jury, nor admitted by the defendant?

(3) Is the felony murder statute unconstitutional *per se*?

(Exh. N at 6.) The State filed an answering brief, and Petitioner filed a reply. (Exhs. O & P.)

The Arizona Court of Appeals affirmed the convictions and sentences in a memorandum decision, rejecting Petitioner's claims. (Exh. Q.) Specifically, with regard to Petitioner's claim that the felony murder statute was "unconstitutional *per se*," the court stated that the Arizona Supreme Court had already rejected this argument. (Id. at 9, ¶ 18.) The court also concluded that Petitioner's argument that the sentence for felony murder violated the Eighth Amendment's prohibition against cruel and unusual punishment was also "meritless." (Id. at 9, ¶ 19.)

Petitioner, through counsel, filed a petition for review to the Arizona Supreme Court, raising the single issue: "Did the trial court reversibly err in its instruction to the jury regarding the offense of attempted second-degree murder?" (Exh. R.) The State filed a "notice of acknowledgment," noting this issue "was adequately resolved against [Petitioner]'s position on appeal." (Exh. S.) On March 24, 2006, the Arizona Supreme Court summarily denied review. (Exh. T.)

On April 25, 2006, Petitioner timely commenced his first PCR proceeding by filing a PCR notice. (Exh. V.) The trial court initially appointed Theresa Armendarez to represent Petitioner, but later appointed Richard Gierloff as counsel after Ms. Armendarez moved to withdraw. (Exhs. W-Y.) After receiving four extensions of time, Mr. Gierloff filed a notice stating he had completed review of the record and correspondence from Petitioner, and was "unable to find any claims for relief to raise post-conviction proceedings." (Exhs. Z & XX.) The trial court gave Petitioner an extension of time to file a *pro per* PCR petition. (Exh. AA.)

- 6 -

1    On March 4, 2008, Petitioner filed a *pro per* PCR petition, after the trial court had
2    granted 11 additional extension-of-time requests. (Exhs. BB & XX.) He essentially re-raised
3    all of the issues that were raised to the Arizona Court of Appeals on direct appeal. (Exh. BB.)
4    He also argued that the trial court failed to supplement the felony murder jury instruction
5    with an instruction regarding causation, and that his trial attorney provided ineffective
6    assistance by failing to request a causation instruction. (Id. at 1-2, 5-6.) Petitioner then filed
7    another version of his PCR petition, which was notarized and raised the same issues. (Exh.
8    CC.)

9    On March 25, 2008, the trial court ordered Petitioner to file a certification pursuant
10   to Rule 32.5, Arizona Rules of Criminal Procedure ("Rules"), that "he has included in his
11   Petition every ground known to him for vacating, reducing, correcting, or otherwise changing
12   all judgments or sentences imposed upon him." (Exh. DD.) Petitioner filed a "notice of
13   application certificate." (Exh. EE.) The trial court found the certificate did not comply with
14   Rule 32.5, and gave Petitioner additional time to file the correct certificate. (Exh. FF.) On
15   June 20, 2008, Petitioner filed the required document. (Exh. GG.)

16   The State responded to the PCR petition, arguing the claims that had been raised on
17   direct appeal were precluded pursuant to Rule 32.2(a)(2). (Exh. HH at 5-7.) The State also
18   argued that Petitioner waived his claim regarding the causation instruction because he could
19   have raised this claim on direct appeal, and it was precluded from a PCR proceeding. (Id. at
20   7-8.) Further, the claim lacked merit. (Id. at 8-9.) Finally, the State argued that Petitioner's
21   ineffective-assistance-of-counsel ("IAC") claim lacked merit. (Id. at 9-11.)

22   On January 15, 2009, the trial court dismissed Petitioner's PCR petition. (Exh. II.) It
23   found the three claims that had been raised on direct appeal were precluded from review by
24   Rule 32.2(a)(1) and (2). (Id. at 2.) The court then dismissed the remaining claims, stating,
25   "[Petitioner] also seeks relief by claiming ineffective assistance of counsel by reason of his
26   trial attorney's failure to seek a causation instruction. This claim is precluded by Rule
27   32.2(a)(1) and (3). Alternatively, for the reasons stated in the State's Response no causation
28

1  instruction was warranted." (Id.) Petitioner did not seek review of the dismissal in the
2  Arizona Court of Appeals or the Arizona Supreme Court. (Exh. XX.)
3         On May 27, 2011, Petitioner filed a document entitled, "Special Action to stay order
4  of sentencing and commitment." (Exh. JJ.) The trial court treated it as an "untimely Petition
5  for Post-Conviction Relief." (Exh. KK.) Petitioner claimed that:

   (1) the trial court "lacked jurisdiction in his matter";

   (2) "the Grand Jury indictment was erroneously amended outside the presence of the Grand Jury"; and

   (3) "the indictment was insufficient as a matter of law."

The trial court noted this was Petitioner's second PCR proceeding, and it was "successive and untimely filed." (Exh. KK at 1.) The court concluded that Petitioner could not raise "these claims in an untimely Rule 32 proceeding," and that none of the claims fell into the exceptions listed in Rule 32.1(d), (e), (f), (g), or (h). (Id.) Because Petitioner failed "to state a claim for which relief can be granted in an untimely Rule 32 proceeding," the trial court dismissed the PCR proceeding. (Id. at 2.)

       On January 21, 2014, Petitioner filed the instant habeas petition, which advances three grounds for relief:

   Ground One: "Arizona's felony murder statute violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment."

   Ground Two: "First-degree felony-murder violates the 8th Amendment prohibition against cruel or unusual punishment."

   Ground Three: Trial counsel provided ineffective assistance by:

       (a) failing "to preserve federal constitutional issues for habeas review in state and federal courts";

       (b) failing "to object to the amendment of the indictment to allege accomplice liability";

       (c) failing "to object to the constitutionality of the felony-murder statute";

       (d) failing "to object to suggestive pretrial identification procedures";

       (e) failing "to object to the admission of prosecution evidence proffered under the 'law of the case' doctrine where Petitioner defended the charges on the basis of misidentification and where co-defendant Frederick King had claimed self-defense";

- 8 -

(f) failing "to object to the testimony of prosecution witness Christopher Mays";

(g) failing "to request proximate causation instruction on the second-degree murder charges as well as on the felony-murder charge"; and

(h) "notwithstanding Petitioner's waiver," having a "conflict of interest that adversely affected the adequacy of representation where Petitioner defended the charges on the basis of misidentification and co-defendant Frederick King defended the charges on the basis of self-defense."

## DISCUSSION

In his Answer, Respondent contends that Petitioner's habeas petition is untimely and must be dismissed.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a statute of limitations on federal petitions for writ of habeas corpus filed by state prisoners. See 28 U.S.C. § 2244(d)(1). The statute provides:

A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

"[T]he period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the period within which a petitioner can file a petition for a writ of certiorari from the United States Supreme Court, whether or not the petitioner actually files such a petition." Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th Cir. 1999). Additionally, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the limitations period. 28 U.S.C. § 2244(d)(2); see Lott v. Mueller, 304 F.3d 918, 921 (9th Cir. 2002). A state

petition that is not filed, however, within the state's required time limit is not "properly filed" and, therefore, the petitioner is not entitled to statutory tolling. See Pace v. DiGuglielmo, 544 U.S. 408, 413 (2005). "When a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)." Id. at 414.

A post-conviction petition is "clearly pending after it is filed with a state court, but before that court grants or denies the petition." Chavis v. Lemarque, 382 F.3d 921, 925 (9th Cir. 2004). In Arizona, post-conviction review is pending once a notice of post-conviction relief is filed even though the petition is not filed until later. See Isley v. Arizona Department of Corrections, 383 F.3d 1054, 1056 (9th Cir. 2004). An application for post-conviction relief is also pending during the intervals between a lower court decision and a review by a higher court. See Biggs v. Duncan, 339 F.3d 1045, 1048 (9th Cir. 2003) (citing Carey v. Saffold, 536 U.S. 214, 223 (2002)). However, the time between a first and second application for post-conviction relief is not tolled because no application is "pending" during that period. See Biggs, 339 F.3d at 1048; see also King v. Roe, 340 F.3d 821 (9th Cir. 2003) (The petitioner was "not entitled to tolling during the interval between the completion of one round of state collateral review and the commencement of a second round of review."). Moreover, filing a new petition for post-conviction relief does not reinitiate a limitations period that ended before the new petition was filed. See Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003).

The statute of limitations under AEDPA is subject to equitable tolling in appropriate cases. See Holland v. Florida, 560 U.S. 631, 645-46 (2010). However, for equitable tolling to apply, a petitioner must show "'(1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstances stood in his way'" and prevented him from filing a timely petition. Id. at 648-49 (quoting Pace, 544 U.S. at 418).

The Court finds that Petitioner's Petition for Writ of Habeas Corpus is untimely. The Arizona Supreme Court denied Petitioner's petition for review of his direct appeal on March 24, 2006. (Exh. T.)  Petitioner's convictions became final 90 days later – on June 22, 2006 – when the time expired for filing a petition for writ of *certiorari* in the United States

Supreme Court. See 28 U.S.C. § 2244(d)(1)(A) (providing AEDPA statute of limitations begins "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review"); Porter v. Ollison, 620 F.3d 952, 958-59 (9th Cir. 2010) ("When, on direct appeal, review is sought in the state's highest court but no petition for *certiorari* to the United States Supreme Court is filed, direct review is considered to be final when the *certiorari* petition would have been due, which is 90 days after the decision of the state's highest court.").

Petitioner, however, filed his notice of post-conviction relief before his convictions became final. (Exh. V.) Because the notice was properly filed, it started tolling AEDPA's 1-year statute of limitation before it started to run. The first PCR proceeding was "pending" and tolled AEDPA's statute of limitations until January 15, 2009 – when the trial court dismissed Petitioner's PCR petition. (Exh. II.) Petitioner did not take any further action in this PCR proceeding. Because nothing was pending after the trial court's decision, the statute of limitations began running the next day. See Hemmerle v. Schriro, 495 F.3d 1069, 1074-77 (9th Cir. 2007). The limitations period continued running uninterrupted for one year – until January 19, 2010 – when it expired.[4] Petitioner did not file his habeas petition until January 21, 2014 – just over four years too late.

Petitioner's subsequent untimely PCR proceeding was filed after the limitations period had expired (Exh. JJ), and, thus, did not toll the limitations period. See Ferguson, 321 F.3d at 823 ("[S]ection 2244(d) does not permit the re-initiation of the [federal 1-year] limitations period that has ended before the state petition was filed."); see also Pace, 544 U.S. at 413-17 ("Because the state court rejected petitioner's PCRA petition as untimely, it was not 'properly filed,' and he is not entitled to statutory tolling under § 2244(d)(2).")

In sum, Petitioner filed the instant habeas petition just over four years after the 1-year limitations period expired. The Petition is therefore untimely.

---

[4] The actual end-date fell on Saturday, January 16, 2010. The next following business day was Tuesday, January 19, 2010.

- 11 -

The Ninth Circuit recognizes that the AEDPA's limitations period may be equitably tolled because it is a statute of limitations, not a jurisdictional bar. See Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1288 (9th Cir. 1997), overruled in part on other grounds by Calderon v. United States Dist. Ct. (Kelly), 163 F.3d 530, 540 (9th Cir. 1998). Tolling is appropriate when "'extraordinary circumstances' beyond a [petitioner's] control make it impossible to file a petition on time." Id.; see Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002) (stating that "the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule") (citations omitted). "When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999). A petitioner seeking equitable tolling must establish two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace, 544 U.S. at 418. Petitioner must also establish a "causal connection" between the extraordinary circumstance and his failure to file a timely petition. See Bryant v. Arizona Attorney General, 499 F.3d 1056, 1060 (9th Cir. 2007).

Petitioner argues that he has been diligently pursuing his rights because he contacted the Arizona Justice Project and various attorneys to help him pursue his claims. Other than his conclusory statements, however, Petitioner fails to provide any evidence that he contacted different counsel, or what said counsel were doing during this time frame on his behalf. See, e.g., Arthur v. Allen, 452 F.3d 1234, 1251-53 (11th Cir. 2006) (concluding efforts to retain counsel did not show diligence in pursuing habeas claims); Jihad v. Hvass, 267 F.3d 803, 806 (8th Cir. 2001) ("[A]n unsuccessful search for counsel was not an extraordinary circumstance warranting equitable tolling."). And, although attorney misconduct that is sufficiently egregious, essentially amounting to abandonment, can be a basis for equitable tolling, Petitioner has not provided any evidence or argument of abandonment, and a "garden variety claim" of attorney negligence is not a sufficient basis for equitable tolling, see Porter, 620 F.3d at 959 ("Attorney negligence, including miscalculation of a filing deadline, is not a

sufficient basis for applying equitable tolling to the § 2244(d)(1) limitation period."); Spitsyn v. Moore, 345 F.3d 796, 800 (9th Cir. 2003) (stating "ordinary attorney negligence will not justify equitable tolling").

After his first PCR proceeding was dismissed in January 2009, Petitioner waited over 2 years to file a second PCR proceeding. (Exhs. II & JJ.) After this proceeding was dismissed on July 27, 2011, he waited almost a year later to file a motion for "Protective Petition Concerning AEDPA's Limitation Period." (Exh. KK; Doc. 1, Cause No. 2:12-CV-01410-SLG-MHB.) When the Court denied the motion, it provided Petitioner with an overview of requirements to file a petition for writ of habeas corpus and "court-approved forms for filing a habeas petition." (Doc. 3, Cause No. 2:12-CV-01410-SLG-MHB.) Petitioner, however, waited over 1 year and 5 months to file his current habeas petition. (Doc. 1.) Thus, Petitioner has not shown that he has been diligently pursuing his rights.

Further, Petitioner has not shown an extraordinary external circumstance stood in his way and prevented him from timely filing his habeas petition. As previously stated, Petitioner has not made any allegation that he was abandoned by an attorney, nor has he alleged that his attorneys did (or did not do) anything that prevented him from timely filing a habeas petition. See Lugo v. Secretary, Florida Dep't of Corrections, 750 F.3d 1198, 1209 (11th Cir. 2014) ("[V]ague allegations about the existence of impediments, without more, or an argument that fails to explain how such impediments prevented the timely filing of the petition, does not establish extraordinary circumstances.").

Petitioner argues that "he was not advised about pursuing federal habeas corpus in pro per, and the exceedingly confusing procedural mechanisms of state law and the AEDPA tripped him up." The Ninth Circuit, however, has repeatedly held "that a *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling." Rasberry v. Garcia, 448 F.3d 1150, 1154 (9th Cir. 2006); see Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1013 n.4 ("[A] *pro se* petitioner's confusion or ignorance of the law is not, itself, a circumstance warranting equitable tolling.").

1  Petitioner also appears to suggest that he is entitled to equitable tolling because he
2  "graduated from high school a mere 6 days" before the crimes occurred. Petitioner, however,
3  does not explain how his age made it impossible for him to file a timely habeas petition.
4  Petitioner is not entitled to equitable tolling merely because of his age. See, e.g., Mancilla
5  v. Subia, 2010 WL 5559505 at *3 (C.D. Cal. Nov. 30, 2010) ("Age is simply an extension
6  of petitioner's ignorance of the law argument.").

7  Finally, Petitioner does not make any claim of actual innocence.

8  In sum, Petitioner is not entitled to equitable tolling. Petitioner's habeas petition is
9  untimely.

## CONCLUSION

11  Having determined that Petitioner's habeas petition is untimely, the Court will
12  recommend that Petitioner's Petition for Writ of Habeas Corpus (Doc. 5) be denied and
13  dismissed with prejudice.

14  **IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of
15  Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH**
16  **PREJUDICE**;

17  **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave
18  to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the Petition is
19  justified by a plain procedural bar and jurists of reason would not find the procedural ruling
20  debatable.

21  This recommendation is not an order that is immediately appealable to the Ninth
22  Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of
23  Appellate Procedure, should not be filed until entry of the district court's judgment. The
24  parties shall have fourteen days from the date of service of a copy of this recommendation
25  within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1);
26  Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen
27  days within which to file a response to the objections. Failure timely to file objections to the
28  Magistrate Judge's Report and Recommendation may result in the acceptance of the Report

and Recommendation by the district court without further review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72, Federal Rules of Civil Procedure.

DATED this 23rd day of April, 2015.

*Michelle H. Burns*
Michelle H. Burns
United States Magistrate Judge